The next case is Impacts Laboratories in AstraZeneca v. Lynette Holdings, 2017-2020, Mr. Veselikoff. Thank you, Your Honor. Please, the Court. This is a case in which the District Court did conduct an analysis, looked at the prior art, looked at the differences between the prior art and the claimed invention, and found that every single element of every claim was found in the prior art, that none of those limitations, none of those requirements created an unobvious subject matter except one. Those findings, with respect to all those other claim elements, are not under consideration. They have not been challenged by either party in this case. The one claim element that the District Court found to allegedly be missing from the prior art, as characterized by the District Court, is a teaching of the combination of a nasal spray with Zolmatriptan. The claims in the case of the prior art that we've relied on, the Chaveau reference, expressly and explicitly teaches the combination of a nasal spray with Zolmatriptan. But Chaveau had more than Zolmatriptan, it had Capryl-Capryl compound associated with it, and all these references seem to have some, they were diluted, they recited a lot of compounds, and there was a lot of evidence here. The judge heard an expert, Dr. Rappaport, who said this finding was surprising, counterintuitive, shocking, and there was evidence of the license. Someone paid millions of dollars for this product, lending authenticity to validity. So let me try to address a couple of those issues. First of all, Your Honor, with respect to unexpected results, the District Court specifically held there were no unexpected results in this case. That was a ruling, again, that's not challenged by the District Court. With respect to your question about Chaveau, Chaveau actually, and I think that's a fog created by the patentees in this case, Your Honor, Chaveau actually only identifies three specific compounds for use in his formulation. And one of those compounds is described in one sentence. The other two compounds are, and I can point to the record, are Sumatriptan and Zolmatriptan. Those are the, and those are the only two compounds that Chaveau teaches as being active in treating migraine. But the trial court found, and there are a lot of findings here about what the reference has disclosed, to which we owe some deference, and the trial court said that Chaveau specifically teaches away from using Zolmatriptan, and there was a metabolism issue here. Yes, that's correct. That's one reason why the expert witness said it was shocking and counterintuitive, because you had to have the metabolism metabolite for the activity, and therefore using Zolmatriptan wasn't obvious. Yes, so that goes to the teaching away. The District Court read the Chaveau reference and said the Chaveau reference teaches away from the use of Zolmatriptan in a nasal spray. That decision is erroneous for a couple of reasons. Number one, the, Chaveau says nothing, and the basis for that is supposedly this active metabolite. Active metabolite is not mentioned at all in Chaveau. It's not mentioned, and the District Court notes that, but it says it kind of backdork talks about active metabolite, because Chaveau, and this is very important, Your Honors. One of the main purposes of Chaveau is to not use oral dosage forms. Chaveau says that an oral dosage form has a disadvantage because the active ingredient degrades, i.e. becomes not useful in the gut, and therefore I've made formulations that are specifically designed to be useful out other than oral, pharyngeal, buccal, and nasal. And of those three, Chaveau says nasal is preferred. In fact, nasal is in the title of Chaveau. So a person skilled in the art, and I would cite the Merck case for this, Your Honor, which says you can't have a teaching away, or you can't make a proper argument for teaching away when the reference, that allegedly teaches away, plainly and unequivocally teaches toward the invention. Okay, can I ask this? Suppose just for purposes of this question, that the relatively high standard of teaching away isn't met here. Correct. The District Court formulated its decision in, I think, first, second, third, and at no motivation and no reasonable expectation of success. And the underlying core logic was that people understood from the prior art that for zolmatriptan, it was in fact the metabolite that was doing most of the work. And therefore, even though it's listed in a quite long list in Chaveau, a much shorter list in what, Pellet or whatever. Well, no, the list in Chaveau is just sumatriptan and zolmatriptan. Well, but that's one little paragraph in a long list. Well, no, that's a paragraph by itself. That's, we're not disagreeing. Oh, I'm sorry, Your Honor. There are many, many, many more paragraphs in Chaveau about what you can put in nasal sprays, right? There's one more paragraph. Just one? Yes. Okay, good. All right. Anyway, why isn't the district court's finding of no motivation and no reasonable expectation of success putting aside teaching away enough because doing this with a nasal spray for zolmatriptan would actually undo what was understood to be at least the main mechanism for getting the active ingredients to do its work? Okay. A couple of quick points. Number one, and this is very important, the record is clear and unequivocal that the level of active metabolite appears in the blood using nasal spray at the same level as oral after three hours. So there's not a question here that the metabolite would not end up in the user's body. Right. But time is important. Yes. It would take three hours. But two things. Number one, motivation to combine doesn't apply here because we're not combining two references. Chaveau is one reference. All of the motivation cases relate to a motivation to take the teaching from one reference and put it with another. There are some cases where the motivation to combine has to do with finding something that's not in the reference and not using another reference but the level of skill to say it would be motivated to put that missing element in. We have no missing element here at all. Both nasal spray and zolmatriptan are in the case. Okay. But part of the problem here is that neither side has addressed a couple of relevant cases here which bear on that question, on that argument that you just made. One of them is Stepan and one is Kenametal. Stepan is in the obviousness context and Kenametal is in the anticipation context. And they're both dealing with this particular issue of when you're going to say that a reference teaches something so that it becomes irrelevant for obviousness purposes as to whether there was a motivation to combine. And what Stepan says is if there's a large number of possible combinations in the patent that won't necessarily result in treating the combinations having been disclosed. And Kenametal says something similar in the anticipation context. And so it seems to me the question is whether we read this Chabot patent and also the other patent, Pretzker, whatever it's called, as disclosing the combination because there are too large a number of references in the patent. Yes. Okay. So I would say that the Stepan case does not apply here because there is not a large number of alternatives. If you look at two, there's two things that are relevant. But look at Chabot. It mentions antibiotics, bacteria, stents, antihistamines. It's a whole long list of things. So what Judge Dike is saying, if there's a large genus that doesn't necessarily disclose or render obvious each possible species. But we're not picking from that list, Your Honor. That Zomatriptan is not in that list. That long list. It's in two paragraphs below. Consider Chabot as having a large list of things you can put in a nasal spray. As it happens, it's in three paragraphs. So what? What Judge Lurie was just reading was the first paragraph, which covers a lot. And even in that case, Your Honor, I would submit there's no requirement in the law for motivation to combine. And the reason is this. It's prima facie obvious for a person skilled in the art to combine an ingredient from one long list or an element, if you want to call it that, an element from one long list with an element from another long list. Importantly, that does not mean it's per se not obvious, okay? It's prima facie obvious. So if I have a long list, it's 100 ingredients. And let's assume I had a list of 100 applications, which I don't. There's only three applications, dosage methods in Chabot. It's prima facie obvious to pick one from that list of three and one from that list of, let's say, it's 100. That's prima facie obvious. I don't need to show a motivation to combine. What I do need- I would have thought you would focus on the paragraph in column three of Chabot, line 12, which says the active substance can be in particular an anti-migraine active substance such as tryptan, such as sobatryptan. In other words, we don't just have a large undifferentiated list here. We have a paragraph in the prior art which in particular focuses on sobatryptan. That's- you're right, Your Honor. And that was kind of the point I was trying to make earlier by saying those two things are mentioned in a single paragraph as being the active ingredients for migraine relief. And there's only those two that are suggested for that. I think an important point to make here, Your Honor, is that- and this goes back to the teaching away question. And that can apply as well because even if you were to assume all the factual determinations that the judge made were correct, when in fact we think they're clearly erroneous relating to this metabolite issue, you would come to the conclusion that at most the use of the nasal spray would be, let's say, expected to have the disadvantage of getting the metabolite into the bloodstream later. The reason that can't be a teaching away is because the claim allows that. That is within the scope of the claim. Why can it not, however, be a sufficient reason for finding insufficient motivation and insufficient expectation of success? Again, I think the- if we're not talking about teaching away, we're talking about motivation. The motive- we don't need a motivation here, number one, because there's a prima facie obviousness. And number two, as Judge Dyke said, we have the motivation, number one, in Chaveau where he says, in particular, these are the two drugs for relieving migraine. And he clearly points to nasal as the preferred way of administering that drug. The other thing is, there's two other references which the district court did not even address, which also specifically teach the use of Zolmetriptan to- by itself, which the judge said is not in the prior art, but they- and that's Penkler and Robertson. And those- What was the role of Penkler in your formulation of an obviousness case here? We- it was addressing the judge's concern that there was a teaching in the record that- Did you say, or have to say, the way you would in an IPR? One of our bases for obviousness is obviousness in light of Penkler. No, I don't think we did, because that was addressing an error in the- our citation of those references explained to the judge that there was motivation in the prior art to combine nasal spray with Zolmetriptan. The judge concluded that motive- So you were using Penkler not as prior art in itself, rendered as obvious, but as evidence that there would be a motivation to combine? There would be a motivation, and that the judge's reason for not finding a motivation was factually wrong. The judge said there would be no motivation because there's nothing in the prior art that shows Zolmetriptan works, okay? That was the basis for the judge's conclusion, and the only thing the judge cited for that was two experts who said they couldn't recall on the stand which items of prior art disclosed the working of Zolmetriptan as a migraine relief agent. And Penkler and Robinson both specifically say Zolmetriptan is a triptan which was specifically formulated to relief migraine. Counsel, you've consumed your time, including your rebuttal time, but we'll give you three minutes back for rebuttal. Thank you. Mr. Hurst. May it please the court, Jim Hurst. Good morning, your honors. So you would agree, I assume, that if a prior art reference disclosed Zolmetriptan and nasal spray, even though it didn't disclose the pHs that we're dealing with here, that we wouldn't be talking about motivation to combine because the prior art would have already told you to make the combination, right? No, I disagree, your honor. You disagree? No. And let me tell you why. Because in the obviousness context, I think you look at the prior art as a whole. That's what the case law teaches. You look at the prior art as a whole. And here, the only real meaningful motivation to make a nasal spray for migraine treatment, because it's generally disfavored, especially for systemic treatment, is to get faster relief. So the prior art as a whole... I'm not understanding. Why, if the prior art specifically disclosed a combination of Zolmetriptan and a nasal spray, why can't that be part of the starting point for an obviousness analysis without worrying about motivation to combine those things when the combination's already disclosed? Because I think that one of ordinary skill in the art would look at the prior art as a whole and know that the metabolite is 2 to 8 times more potent than Zolmetriptan itself. So that POSA would say to themselves, is this a good idea? It's not a good idea. I do not have a motivation to pursue. I don't understand how that argument can be consistent with Stepron and with Kenametal, both of which suggest that if something is disclosed in the prior art, that's, at least Stepron says, that's what you use for the obviousness analysis. Because, let me make two points. Because for prima facie obviousness, you have to look at all of the art, which would include the teaching about the more potent metabolites, so that would discourage you from moving forward. Number one. Number two, you also... If it's combined already, why do you need a motivation to combine? Because one of ordinary skill actually considers the art as a whole and evaluates that statement about whether or not it makes sense to actually pursue it, a motivation to pursue it. And also, your honor, we need a reasonable explanation. But look at that two... ...column three that has already been referred to. In particular, that pattern refers to somatriptan and zolmetriptan for intranasal use. Isn't that what's claimed? It is claimed, but look at the rest of the disclosure in Chabot. There isn't a massively long list here, twenty-five categories of drugs, twenty-five categories of drugs. None of them say in particular. Take a look at column two. Line fifty. The active substance can be in particular, and then they describe a class of compounds which would include thousands of compounds. Thousands of compounds. And then, if you take a look at the very next sentence, the one that you focused on, Judge Lurie, it says, the active substance can also be in particular an anti-migraine active substance. There's hundreds of anti-migraine active substances. Such as? Such as a tryptan. There was, in the record, an enormous number of tryptans disclosed in the prior art. And they say such as. This is tough prior art. It's, it's, look, there's no question about the word zumatryptan, I mean, I'm sorry, the word zomatryptan is in a patent that has three different routes of administration. No question about that. I get that. But here the judge looked at this specifically and said to, and, and came to the conclusion based on experts that he, our experts, that he found to be, they articulated their opinions convincingly and with reasoned support, and he made a factual finding. For, for the other side to prevail on this appeal, they. Which factual finding do you have in mind? The key factual finding, I think, is that he, he, this district court found that it would be absolutely counterintuitive to make a nasal spray when you have an active metabolite which is more potent than the drug itself. But, but he didn't make a finding on the issue we've been talking about just now as to, as to whether the prior art disclosed the combination. He did because what he said is even though it's on this long list of drugs, he talked about Chabot, even though it's on this long list of drugs, and there's an enormous number of choices, what the district court found was a skilled artisan would look to any other tryptan, this is a finding at page 58 of the court's opinion, a skilled artisan would look to any other tryptans before looking to zomatryptan to develop a pharmaceutical product that would not take advantage of first pass metabolism, i.e. the nasal spray. Okay, that's a question of motivation to combine. Let me ask a question about motivation to combine. Let's assume for the moment that there does need to be a motivation to combine. This record is replete with evidence that there are advantages to a nasal formulation over an oral formulation, and based on the fact that in the migraine context, vomiting is a serious problem, and that obviously if you take a pill and throw it up, it's not going to do you any good, the district court did not pay any attention to that very significant evidence that that would provide a motivation to combine zomatryptan with a nasal spray. What's your response to that? I disagree that the district court didn't look at that, Your Honor, but also the record He never discussed it in the opinion at all. Is that correct? No, that's not correct. Where did he discuss it in the opinion? He discussed the fact that there's a balancing, Your Honor. Where did he discuss that there was a powerful motivation to combine zomatryptan with a nasal spray because of the difficulties with an oral formulation? He found the opposite, Your Honor, what I read before. But where does he discuss the evidence? For which part, Your Honor? The evidence providing the motivation to combine zomatryptan with a nasal spray because it avoids the vomiting problem. Let me, I'm not going to have a specific page reference for Your Honor, but I want a specific, is there any? I'm going to find one. No, no, tell me where it is. Let me tell you what he did discuss. No, I want to see where he discussed it. He's going to talk about the fact that, I'm going to give a hint to my colleagues, okay? He talked about the fact that, look, in the history of migraines, only two nasal sprays were created. One of which... I want you to answer my question. It's not... Did he discuss the reason to combine zomatryptan with a nasal spray because of the vomiting problem? He discussed... Did he discuss that? The answer is yes, indirectly. He discussed that because... Not directly. Because zomatryptan... Answer my question. I do not remember whether he said zomatryptan would solve the throw-up problem. When he did so, he talked about the only... In 40 years of migraine treatment, despite this incentive you talked about to try to get faster-acting treatment from nasal sprays, only two nasal sprays in the history, even to this day, in the history of migraine treatments have been, were created before zomatryptan, one of which caused throw-up, Your Honor. Mr. Hurst... Zomatryptan... Mr. Hurst, why doesn't... Why isn't Pankler in anticipation? It discloses a small group of tryptans, including zomatryptan, and it says intranasal administration is preferable. Okay. Why isn't that in anticipation? And, Judge Lurie, I hate to do this, but I just... Because it's such an important point to Judge Zeit, can I just finish the thought? Well, you have about five minutes to answer it. I'm sorry. Why don't you go ahead and answer, Judge Lurie? My point is the only tryptan ever used in a nasal spray before exasperated throwing up, exasperated nausea. So that's what the art was at the time. It doesn't have the property which wasn't present in zomatryptan. There's no... They're both tryptans. They would both be expected to taste nasty and cause more nausea, to your point, Your Honor. Pankler and Robertson, and I think counsel conceded this, there are two references that are discussed mostly in the reply brief. Down below and in their post-trial brief, they did not rely on either Pankler or Robertson as... You're saying it was waived? It was waived. Because all they have done, even in their opening brief in this case... And did the district court discuss Pankler? I don't think the district court referenced Pankler in any meaningful way, to the best of my knowledge, because neither did counsel in their brief. They have literally one paragraph on each in the background fact section, and they never make any invalidity arguments in the argument section of their post-trial brief, just as they did in the opening brief to this court. So we should uphold the patent if there is a reference out there, against a reference out there, that because it wasn't really cited and argued and decided. Yes, for one reason. But another reason is that if we had litigated them, neither helps them at all. That's why they said Chabot was their very best reference. Both Robertson and Pankler have a huge class of potential compounds with no reference about which ones are more likely to be successful than the other. So it's like the case that you referenced before, Judge Dyke. And just like Chabot, there's a large class of compounds with no direction over which ones would be successful or wouldn't be successful. But just to give you a couple things about Pankler and Robertson, Robertson, here's what it says about nasal sprays. It says they have a large genus of compounds, indols, and it says you can use these with oral, sublingual, buccal, parental, for example, subcutaneous, intramuscular, or intravenous, rectal, topical, and intranasal administration, and where possible, oral administration is preferred. Pankler, Pankler teaches away. What Pankler teaches is that there's a large class of compounds that have absorption problems. And so what they suggest as their invention is to create a chemical complex, as a sort of a new chemical complex, as a cage around the active ingredient to try to increase absorption. And so that's what Pankler teaches, that there's problems with trying to use these compounds in this long list, which would include zomatriptan, because they have absorption problems. And that's why they were never litigated or relied on below, because... Do the claims here preclude the kind of complex that Pankler wants to surround some of these substances with? I believe that they do, and I'm not positive, but the chemical complex, as I read Pankler, and I'm not a chemist, it actually talks about a bonding occurring between the active ingredient and the chemical complex. And it's on page, I know I just have the beginning page of Pankler. But my point is this. Which page in Pankler? It's in Pankler. When they talk about the claimed invention, they have substitutions, and the substitutions would include attaching the chemical compounded issue to the chemical complex to help create the formulation. But the point is that none of this is in the record, because they didn't rely on Pankler and Robertson below. And now is not the time. No, they didn't rely on them. But not as a basis for an invalidity argument. They never... If you read their opening brief, where they have reference to both of these, that's how they argued it below. Just as background information. And they never said, hey, hey, here's why Pankler and Robertson solve our problem with Chabot having just a huge long list. You know, in the end here, the district court made seriously applicable factual findings that we think make the insight case directly on point. What the court said was, a skilled artisan would look to any other triptan, so that if they had Chabot in front of them, they would choose any other triptan before looking at Zomatriptan, because you would lose the effect of this more potent metabolite, the one that's two to eight times more potent. In the insight case, they have a very similar circumstance. What we think that Lynette is doing is they're sort of defining the problem with hindsight. They're saying the only candidate, they're assuming the only candidate is Zomatriptan, and that's not correct. None of the prior references that they actually argued list Zomatriptan as the only candidate. Chabot has a huge long category list. And so what happened in insight versus Sandoz in 2015 is the alleged infringer just assumed away the problem by assuming the active ingredient would be the one to choose. And the district court, and this court said, defining the problem in terms of its solution reveals improper hindsight. That case talked about converting an oral medication into a topical treatment for conjunctivitis. And a related compound had been converted from an oral medification into a topical treatment. The World Health Organization had suggested using that specific compound as a topical treatment for a different eye infection. What did the district court do, your honors? Looked at the characteristics of the drug itself. Didn't just stop at the surface, looked at the characteristics of the drug itself, and the district court found in insight that it would be a poor choice and not a good candidate for topical treatment. This court upheld that ruling for a lack of clear error. That's what our judge did. Our judge didn't stop at the surface, the one snippet in Chabot, or the one snippet in any reference, that our judge dug down and made factual findings. There was no reasonable expectation of success. And that one of ordinary skill in the art would have found it absolutely counterintuitive to choose zomotriptan. They would have went a different direction, a different triptan, even if they wanted to make a nasal spray to try to solve the nausea problem, which had been tried and failed before. The only other triptan that had been used actually made the nausea problem worse, not better. And let me just, I see my time is running out, I just want to make one last point. If this court were to find that there was, that the district court erred in finding no motivation, the proper remedy here would be to remand the case for a finding on whether or not there were surprising results to uphold the validity of the patent, why? Because the only reason the district court did not address our surprising results arguments is because he said we were just reframing our lack of motivation arguments. So he found lack of motivation, that was good enough to hold the patent. But if you were to say there was a motivation, then the proper thing would be to go back to the district court and now evaluate surprising results, because it's all the same evidence, because we think this was a truly surprising and the very first fast-acting migraine nasal spray in the history of migraine medicines. Thank you, your honors. Thank you, Mr. Hurst. Mr. Persilico has some rebuttal time, two, three minutes. Thank you, your honor. A couple of points. There's another piece of prior art, which I think is important, but let me back up and say this first. I disagree with opposing counsel on this question of whether there's been waiver of Penkler and Robinson. That's dead wrong. There's citation in our post-file brief to both of them, and they were cited specifically for the purpose of showing that as cumulative in this sense of Chaveau, it was known in the prior art to combine so many- Well, what about the purchase?  People don't pay that kind of money to buy a product that was covered only by an inactive, by an invalid patent. And then you have the testimony of an expert. Yeah, there was no expert testimony, your honor, on that. It was the judge- Dr. Rappaport didn't say it was counterintuitive and surprising? Oh, yes, but there was no testimony on the reason why the license had any nexus to the claim. The license stands by itself. Except that, no, because there's no nexus. The license, first of all, your honor, and it's in the briefs, in the appendix- No nexus, the licensed product was the intranasal- One of the licensed products was, they sold the brand and the business. That agreement is like that thick, and there's two pages in that agreement that say anything about a patent, that's it. And whatever they paid, all the rest of that agreement has nothing to do with the patents because they sold the business, they sold the brand. Impacts' own testimony was that they were buying a strong brand, has nothing to do with the patents. They were buying an ongoing business, and there's no evidence to the contrary. There's not a single shred of evidence that Impacts paid any amount of money for the patent protection, or because they thought the patents were valid. They were selling a brand, number one. Number two, all of this argumentation about the unexpected result because of the metabolite doesn't apply, first of all, it doesn't apply because it's comparing to Zolmetriptan in an oral tablet, which is not the closest dart. We already have Zolmetriptan in a nasal spray, and so if you're going to establish that there's some unexpected result, it has to be that something unexpected was done by Dern compared to what's taught in Chavot, and there's no evidence at all that there's anything unexpected. The only argument that was ever made, and this was in the prosecution, was that the PH created an unexpected result, and the judge, and they made that argument at trial, and the judge knocked it down, said there's no such unexpected result. What about Mr. Hurst's point that the district court sentence saying I don't find unexpected results follows a little paragraph that says, because even though there are actually unexpected results, I already took care of that in the first part of the analysis. The unexpected result being that it might be worthwhile to lose the metabolite effect, the very fast metabolite effect of Zolmetriptan taken orally. And so yes, the judge said this, and the judge equated it with the lack of motivation, but again, that he equated it based upon an error of fact, and the error was that he read the record as saying Zolmetriptan by itself doesn't have effect, okay? And that's what Pengler and Robinson specifically say. These drugs were designed, forgetting about a metabolite, were designed to have effect, and so they would have effect. Then you would, by using them in a nasal spray, you would get their effect, plus all the benefits of them being in a nasal spray. Couple of other quick points. This question about- One quick point, since your time has expired. Okay, let me figure out the best one, okay. The question of counterintuitive. I think that's also actually suggests that this is not patentable, because there's not a single shred of evidence- That's a counterintuitive comment. And I'll explain why. Because first of all, it's not a standard for obviousness. But if it were, there's not a single shred of evidence to indicate that Dern counterintuited this before Chabot. Not a single shred. The information about the metabolite was known before Chabot made his invention. And he said, you can get fast- And he specifically refers to fast migraine relief. He says, you can get fast migraine relief using my nasal spray and Zoma Triptan. Thank you, counsel. Let's hope none of us need this product. Thank you.